## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**                          **CRIMINAL ACTION**

**VERSUS**

**WALTER GLENN, ET AL.**                          **NO.: 15-00138-BAJ-RLB**

### RULING AND ORDER[1]

Before the Court are motions to suppress filed by Walter Glenn, Larry Walker and Thomas James (collectively, "Defendants"). (Docs. 103, 104, 106[2]). Defendants seek to suppress the evidence seized during a traffic stop on September 2, 2014. (*Id.*). The United States of America ("Government") filed a combined memorandum in opposition. (Doc. 114). On July 7, 2016, the Court held an evidentiary hearing on the motions, and permitted the simultaneous filing of post-hearing briefs. (*See* Docs. 125, 126).

## I.    BACKGROUND

At approximately 9:30 p.m. on Tuesday, September 2, 2014, Sergeant Donald Dawsey ("Sgt. Dawsey") of the West Baton Rouge Parish Sheriff's Office was positioned in his marked police cruiser between the 147 and 148 mile posts on Interstate 10 ("I-10") in Baton Rouge, Louisiana. (Doc. 124, Hr'g Tr. 17:6-10, 65:4-9). Sgt. Dawsey's police cruiser was position perpendicular to I-10 going eastbound. (*Id.*).

---

[1] The subject of this Ruling and Order only pertains to the lawfulness of the traffic stop and the subsequent search of the vehicle. In addition to addressing the propriety of the consent to search, the Court will consider other possible grounds for a lawful search.

[2] James filed a motion to adopt the motions filed by his codefendants. *See* Doc. 106.

An officer with twenty years of law enforcement experience, Sgt. Dawsey was assigned to the narcotics criminal patrol unit. (*Id*. at 13:8-13, 14:13-16).

Defendants were traveling eastbound on I-10 in a silver Chrysler 300 when Sgt. Dawsey pulled the vehicle over onto the side of the interstate after observing a tinted license plate cover affixed to the vehicle in violation of Louisiana Revised Statute § 32:53. (*Id*. at 17:11-12). At the hearing on the motions *sub judice*, Sgt. Dawsey testified that after stopping the vehicle, he approached the vehicle's passenger side and saw a set of screwdrivers in the driver's door console.[3] (*Id*. at 24:3-7). Glenn, the driver, gave Sgt. Dawsey his driver's license and insurance verification. Sgt. Dawsey asked Glenn to exit the vehicle and step to the rear. (Gov. Ex. 1, Video of Traffic Stop). Glenn complied. While at the rear of the vehicle and in front of Sgt. Dawsey's police cruiser, Glenn notified Sgt. Dawsey that the vehicle was a rental car that had been rented by Walker, who was seated in the backseat. Glenn also claimed that the license plate cover was attached to the vehicle at the time of the rental. (*Id*.). Sgt. Dawsey informed Glenn that the tinted license plate cover was illegal and that he "can't believe a rental came like that." (Gov. Ex. 2 at p. 1). Glenn offered to remove the license plate cover, and Sgt. Dawsey told him that removal was optional. (*See id*. at p. 2).

Following that initial exchange, Sgt. Dawsey asked Glenn about their travel history. (Gov. Ex. 1, Video of Traffic Stop). Glenn told Sgt. Dawsey that they were returning from a Labor Day family cookout in Beaumont, Texas, which he

---

[3] Sgt. Dawsey testified that he cannot remember if there was one or two screwdrivers.

2

mispronounced as "Bewmont." (*Id*.). Glenn stated that the drive was approximately twenty-three to twenty-four hours from Connecticut to Texas. He told Sgt. Dawsey that the trip began on Friday, August 29, 2014, and that the car was due back to the rental agency in Connecticut on Friday, September 5, 2014. (*Id*.). Glenn also explained that Walker is his cousin and that they live in Connecticut. He also reported that James is his uncle and that he lives in South Carolina.[4] (*Id*.).

Sgt. Dawsey then told Glenn to remain behind the vehicle while he retrieved the rental agreement from Walker, who was still in the backseat. (*Id*.). Sgt. Dawsey returned to the passenger side of the vehicle and asked Walker for the rental agreement. The officer explained to Walker that the tinted license plate cover was illegal and that he had never seen a rental car with a tinted license plate cover. (*Id*.). Walker told Sgt. Dawsey that he rented the vehicle a week prior and that the vehicle was due back on Friday, September 5, 2014. (*Id*.).

Sgt. Dawsey asked Walker about their travel history and where the vehicle was picked up. (*Id*.). Walker explained that they had been in Beaumont, which he also mispronounced as "Bewmont," for a family visit and that they stopped in Houston. (*Id*.). Walker told Sgt. Dawsey that he rented the vehicle in Connecticut, but he lives in Orlando, Florida. (*Id*.). He explained that he flew to Connecticut for a visit "a couple of weeks ago," and that they then decided to drive to Texas to visit family members. (*Id*.).

---

[4] Neither the Government nor Defendants dispute the accuracy of this information.

After approximately five minutes into the stop, Sgt. Dawsey was in possession of the rental agreement, insurance verification, and Glenn's driver's license. (Doc. 124, Hr'g Tr. 131:3-11). Sgt. Dawsey returned to the rear of the vehicle to further question Glenn about where Walker was from and how Walker travelled to Connecticut. (Gov. Ex. 1, Video of Traffic Stop). Glenn clarified that Walker was born in Connecticut, but is from Florida, and that he drove from Florida to Connecticut. (*Id*.). When asked about the car he drove to Connecticut, Walker stated "he has a Range Rover." (Gov. Ex. 2 at p. 5).

Sgt. Dawsey told Glenn that he was going to "run all the stuff and make sure everything is straight," and that Glenn should remain standing at the rear of the vehicle and in front of his police cruiser. (Gov. Ex. 1, Video of Traffic Stop). Glenn remained as instructed while Sgt. Dawsey was in the police cruiser for an additional five minutes. (*Id*.). While in the police cruiser, Sgt. Dawsey did not "run all the stuff" as he had claimed to Glenn, but called for backup officers to assist in a search of the vehicle. (Doc. 124, Hr'g Tr. 36:21-37:5).

Ten minutes after initiating the stop, Sgt. Dawsey exited the police cruiser and told Glenn that he was still running their information. (Gov. Ex. 1, Video of Traffic Stop). Sgt. Dawsey asked Glenn additional questions about who drove the vehicle from Beaumont, who drove from Houston, and who drove from Connecticut. (*Id*.). Sgt. Dawsey also inquired about the specific day they attended the family cookout and when they drove to Houston. (*Id*.). Glenn told the officer that he and Walker both drove to Beaumont, that Walker later drove from Houston to Beaumont, and that he

drove from Beaumont to Baton Rouge. Glenn also explained that they drove to Houston earlier that day and that the cookout was on Labor Day. In response, Sgt. Dawsey stated "we've gotta big problem people going this way from Houston with you know something like a hundred pounds of [m]arijuana, couple kilos of [c]ocaine, large amounts of U.S. [c]urrency." (Gov. Ex. 2 at p. 7). Glenn responded by saying that they did not have "any of that," and that none of them had criminal drug histories. (*Id.*).

Twelve minutes after initiating the stop—while still in possession of the rental agreement, insurance verification, and Glenn's driver's license—Sgt. Dawsey stated: "Alright. Can I search that car?" (*Id.*). Glenn stated: "Yeah, you can search that car." (Gov. Ex. 1, Video of Traffic Stop). Thereafter, a second officer joined Sgt. Dawsey. Sgt. Dawsey explained to the second officer that the driver said they could search the vehicle but they needed to check with Walker. (*Id.*).

Fourteen minutes after initiating the stop, Walker was ordered out of the vehicle by Sgt. Dawsey, who stated "I asked the driver if I could search the car, and he said yeah." (Gov. Ex. 2 at p. 8). Walker responded, "he said you can search it, search it." (*Id.*).

Shortly thereafter, the two officers were joined by a third officer. All three officers searched the vehicle for approximately twenty minutes before arresting Glenn, Walker, and James. (Gov. Ex. 1, Video of Traffic Stop). During the search, the officers found (1) a screwdriver; (2) a front license plate and bolts;[5] (3) "newly

---

[5] No further description of the license plate was provided by the Government.

purchased items";[6] (4) 114 blank ID cards; (5) 49 blank check sheets; (6) 45 holographic overlays; (7) power inverter; (8) printer; (9) scissors; (10) tape; (11) an iron; (12) $95,000 cash; (13) seven white envelopes with names and social security numbers written on them; and (14) multiple computer devices. (*See* Doc. 114 at pp. 5–6; Doc. 124, Hr'g Tr. 44:4-18; Gov. Ex. 9).

Defendants were subsequently indicted on October 1, 2015, for unauthorized access devices fraud, in violation of 18 U.S.C. § 1029(a)(3). (Doc. 1). On October 29, 2015, the Government obtained a Superseding Indictment against all Defendants, which added two new counts of conspiracy, in violation of 18 U.S.C. § 371, and aggravated identity theft, in violation of 18 U.S.C. § 1028A. (Doc. 13 at p. 5). In the subject motions, Glenn and James contest the justification for the initial stop, all three Defendants contest the duration of the stop, and Walker contests the search of the vehicle.[7]

## II.   DISCUSSION

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  The "exclusionary rule" is a judicially created remedy adopted to effectuate the protections of the Fourth Amendment. *United States v. Calandra*,

---

[6] In the Government's opposition to the motions to suppress, the Government did not describe the "newly purchased items." However, at the hearing, Sgt. Dawsey testified that Glenn informed him that they traveled to Houston and purchased video games from Game Stop. Doc. 124, Hr'g Tr. 134:11-135:18). The Court can only assume that the video games constitute the "newly purchased items."

[7] In Walker's motion and during the hearing, he did not raise as an issue the justification for the initial stop. *See* Docs. 103, 124. Additionally, the Defendants conceded in their post-hearing brief that Glenn did not have the authority to challenge the search and that consent "rises or falls with . . . Walker." *See* Doc. 126 at pp. 4–5.

414 U.S. 338, 347–48 (1974). "Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *Id.* at 347 (citation omitted). The prohibition equally applies to the fruits of the illegally seized evidence. *Id.*

Of course, the Fourth Amendment's protection against searches and seizures is not absolute. The United States Supreme Court has consistently emphasized that "what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." *Terry v. Ohio*, 392 U.S. 1, 9 (1968) (quotation marks omitted) (quoting *Elkins v. United States*, 364 U.S. 206, 222 (1960)). As such, "[t]he touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citing *Katz v. United States*, 389 U.S. 347, 360 (1967)).

It is well established that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quotation marks omitted) (quoting *Katz*, 389 U.S. at 357). Generally, "[t]he proponent of a motion to suppress has the burden of proving, by a preponderance of evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights." *United States v. Kelley*, 981 F.2d 1464, 1467 (5th Cir. 1993) (quoting *United States v. Smith*, 978 F.2d 171, 176 (5th Cir. 1992)). However, in cases where a search is not conducted pursuant to a warrant, the Government bears the burden of proving that the search was valid. *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citing *United*

7

*States v. Castro*, 166 F.3d 728, 733 n.6 (5th Cir. 1999)). Here, Defendants argue that they were subjected to an unlawful seizure and search in violation of the Fourth Amendment.

### A.     LEGALITY OF THE SEIZURE

"The stopping of a vehicle and detention of its occupants constitutes a 'seizure' under the Fourth Amendment." *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004). To analyze the legality of a traffic stop, courts utilize the two-step standard articulated by the Supreme Court in *Terry v. Ohio. United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010) (citing *Brigham*, 382 F.3d at 506). Under the first step, courts determine "whether the officer's action was justified at its inception." *United States v. Jenson*, 462 F.3d 399, 403 (5th Cir. 2006). Under the second step, courts evaluate "whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *Brigham*, 382 F.3d at 506.

### 1.     Justification of the Traffic Stop at its Inception

"For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (citing *United States v. Breeland*, 53 F.3d 100, 102 (5th Cir. 1995)). When assessing reasonable suspicion, "the court considers the totality of the circumstances—the whole picture." *United States v. Chavez*, 281 F.3d 479, 485 (5th Cir. 2002) (internal quotation marks omitted) (quoting *United States v. Sokolow*, 490 U.S. 1, 7–8 (1989)).

8

Sgt. Dawsey claims that he initiated the traffic stop because a tinted license plate cover was affixed to the vehicle in violation of Louisiana law. (Gov. Ex. 9). According to Louisiana Revised Statute § 32:53(A)(3), "[e]very permanent registration license plate shall at all times be . . . in a place and position to be clearly visible, and shall be maintained free from foreign materials and in a condition to be clearly legible." La. Stat. § 32:53(A)(3). Defendants contend that § 32:53 does not prohibit a tinted license plate cover, but only requires that the information on the license plate be clearly legible and free of foreign materials. (Doc. 126 at p. 1). Defendants aver that Sgt. Dawsey should not have completed the stop once he pulled directly behind the vehicle and could easily read the information on the license plate. (*Id*. at p. 2).

Sgt. Dawsey testified that he could not see the information on the license plate when his police cruiser was parked on the I-10 median. (Doc. 124, Hr'g Tr. 138:1-4). After he pulled behind the vehicle, however, the headlights of his police cruiser illuminated the license plate and he was able to read the lettering on the plate and the issuing state. (*Id*. at 139:1-8). Nevertheless, the fact that Sgt. Dawsey was eventually able to read the license plate with the illumination of his headlights does not invalidate the officer's stated reason for the stop. *See United States v. Bates*, No. CRIM.A. 12-118, 2013 WL 796064, at *4–5 (E.D. La. Mar. 4, 2013) (finding that the traffic stop for an obscured license plate was justified despite the fact that the officer was eventually able to read the license plate). When Sgt. Dawsey was unable to read

the license plate while parked on the I-10 median, he had reasonable suspicion that a traffic violation occurred and thus was justified in making the stop.

### 2.    Duration of the Traffic Stop

A traffic stop that is justified at its inception can violate the Fourth Amendment if it is prolonged beyond the time reasonably required to complete the mission of the stop. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). The authority for the stop "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez v. United States*, ___ U.S.___, 135 S. Ct. 1609, 1614 (2015) (citing *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).

The "mission" of a traffic stop is "to address the traffic violation that warranted the stop and attend to related safety concerns." *Id.* (internal citations omitted). To effectuate the mission, an officer may check the driver's license, check for outstanding warrants against the driver, and inspect the vehicle's registration and proof of insurance. *Id.* at 1615. The officer may also ask about the purpose and itinerary of the driver's trip. *United States v. Pena-Gonzalez*, 618 F. App'x 195, 198 (5th Cir. 2015) (quoting *United States v. Fishel*, 467 F.3d 855, 857 (5th Cir. 2006)). "These 'matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure,'" so long as the duration of the stop is not extended beyond when the tasks tied to the traffic infraction should have reasonably been completed. *Id.* (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (internal citation omitted)).

A stop may be prolonged, however, if reasonable suspicion of additional criminal activity emerges while an officer is completing the mission of the stop. *United States v. Spears*, 636 F. App'x 893, 901 (5th Cir. 2016). "If the officer develops reasonable suspicion of additional criminal activity, . . . he may further detain [the] occupants [of the vehicle] for a reasonable time while appropriately attempting to dispel this reasonable suspicion." *Id.* (alterations in original) (quoting *United States v. Andres*, 703 F.3d 828, 833 (5th Cir. 2013)).

Here, Sgt. Dawsey testified that in the first five minute of the stop, he had everything he needed to issue a traffic citation and complete the stop. (Doc. 124, Hr'g Tr. 131:5-15). He also testified that he had the driver's license, insurance verification, and rental agreement. (*Id.*). In his Investigation Report, Sgt. Dawsey claimed that he went to his police cruiser to run the information he collected. (Gov. Ex. 9). Yet, at the hearing, he admitted that he did not run any of the information because he was calling for backup officers to assist in conducting a search of the vehicle. (Doc. 124, Hr'g Tr. 36:21-37:5). It is clear from Sgt. Dawsey's testimony that after he retrieved the rental agreement from Walker, the encounter evolved from a traffic stop to an on-scene investigation into other possible crimes. *Rodriguez*, 135 S. Ct. at 1616.

After the period of time when the traffic stop should have reasonably concluded, Defendants' detention was prolonged for an additional ten minutes before Sgt. Dawsey sought consent from Walker to search the vehicle.[8] The lawfulness of the seizure of Defendants during this time period is dependent on whether reasonable

---

[8] *See infra* Part B for the Court's discussion of the constitutionality of the search.

11

suspicion of criminal activity arose during the first five minutes of the stop, *Spears*,

636 F. App'x at 901–02, thus justifying the prolonged stop.

The Fifth Circuit has provided the following instructions when analyzing

reasonable suspicion:

> Reasonable suspicion exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the . . . seizure. Although an officer's reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard. The reasonable suspicion analysis is necessarily fact-specific, and factors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion. We must pay heed to the Supreme Court's admonition not to treat each factor in isolation, and instead must consider the totality of the circumstances and the collective knowledge and experience of the officer. Under the collective knowledge doctrine, reasonable suspicion can vest through the collective knowledge of the officers involved in the search and seizure operation.

*Id.* at 898 (internal citations and quotation marks omitted).

The Government asserts that eleven facts arose to create reasonable suspicion:

(1) inconsistent statements regarding Walker's residency; (2) inconsistent statements

regarding how Walker travelled from Florida to Connecticut; (3) mispronunciation of

the city of Beaumont; (4) the circuitous travel itinerary; (5) Glenn's nervous behavior;

(6) Glenn's willingness to remove the license plate cover; (7) the screwdriver in the

driver's door console; (8) the rental vehicle; (9) the fact that the rental vehicle had a

tinted license plate cover; (10) Defendants were traveling on a drug corridor; and (11)

the interior of the vehicle "was a mess." (Doc. 125 at p. 3).

Many of the facts offered by the Government do not amount to reasonable suspicion, standing alone or in combination with other facts. For instance, it was not improbable for Defendants to mispronounce "Beaumont" under these circumstances. The fact that a motorist mispronounces the name of a city in which he is not a resident, but merely a visitor, is not a fact that supports a reasonable suspicion finding; and the Government has offered no case law upon which this fact has been deemed probative of possible criminal activity.

In addition, it was not suspicious for the interior of the vehicle to be "a mess" after a twenty-three to twenty-four hour drive spanning several states, and the Government has offered no case law upon which clutter and untidiness, under these circumstances, are probative of possible criminal activity.

It was also not improbable for Defendants to drive from Connecticut to Texas for an extended weekend trip. Sgt. Dawsey testified that he thought it was suspicious for Defendants to drive, rather than fly, from Connecticut to Texas. (Doc. 124, Hr'g Tr. 35:20-24). Considering the cost of airline travel, it may have been a prudent fiscal decision for the three Defendants to drive rather than purchase three airline tickets. *See United States v. Madrigal*, 626 F. App'x 448, 451 (5th Cir. 2015) (finding it not unusual for a person of modest means to drive from Mexico to Houston and back in a day).

Regarding the inconsistent statements, the evidence reveals that throughout the entire encounter, there was only one minor inconsistency between the statements given by Glenn and Walker. *Spears*, 636 F. App'x at 902 ("[M]inor, insignificant,

illusory, or reconcilable inconsistencies in a defendant's story are not probative of criminal activity."). The Government identifies two inconsistencies: statements regarding Walker's residency and the method by which Walker travelled from Florida to Connecticut. The Court finds, however, that the statements regarding Walker's residency do not amount to an inconsistency. When Sgt. Dawsey approached Glenn after speaking to Walker, Glenn immediately clarified that Walker was born in Connecticut and now lives in Florida. Thus, the statements offered by Walker and Glenn on this matter were consistent. Nonetheless, Walker and Glenn gave inconsistent statements regarding Walker's mode of transportation from Florida to Connecticut, but the Court concludes that this was a minor and insignificant inconsistency.[9] *See United States v. Macias*, 658 F.3d 509, 521 (5th Cir. 2011) ("Even if Macias and Zillioux's answers are considered inconsistent, inconsistent stories between a driver and passenger do not necessarily constitute articulable facts of reasonable suspicion.").

Walker and Glenn's account of their travel itinerary was entirely consistent. Both men identified Connecticut as their origin and Beaumont, Texas as their destination. Both men explained that the purpose of their travel was to visit family

---

[9] Whether an inconsistent statement can support reasonable suspicion depends on the degree of inconsistency. In *Pack*, 612 F.3d 341, the Fifth Circuit found it was reasonable suspicion when the driver said she and the passenger were visiting her ill aunt in Houston, but the passenger said they were coming from Dallas and that he did not know the driver had family in Texas. In *United States v. Vazquez*, 253 F. App'x 365 (5th Cir. 2007), the Fifth Circuit found it was reasonable suspicion when the passenger said the purpose of the trip to Loredo was to drop his step-daughter off, and the driver said no one came with them to Loredo and the purpose of the trip was to see his father. However, in *United States v. Santiago*, 310 F.3d 336 (5th Cir. 2002), the Fifth Circuit found it was not reasonable suspicion when the driver identified the passenger as his wife, but later identified her as his ex-wife and another individual, the owner of the car, as his wife.

members in Beaumont, Texas, and that the rental car was due back to the rental agency on Friday, September 5, 2014. Although Glenn wrongly stated that Walker drove to Connecticut from Florida, this inconsistency is insignificant and completely attenuated from their Connecticut to Texas travel itinerary. It was entirely reasonable for Glenn—someone who did not accompany Walker during his travel from Florida to Connecticut—to not know the precise mode of transportation Walker used to travel to Connecticut. *See United States v. Estrada*, 459 F.3d 627, 629 (5th Cir. 2006) (finding it was a minor inconsistency and reasonable for the owner of the vehicle to say he owned the vehicle for one month and for his brother to say he owned if for three months); *see also Pack*, 612 F.3d 341, 359–60 (reaffirming that the inconsistency in *Estrada* was reasonable).

Furthermore, the Court is not convinced by the evidence from the video of the encounter that Glenn demonstrated nervous behavior. Sgt. Dawsey testified that Glenn was nervous because he couldn't stop moving. (Doc. 124, Hr'g Tr. 142:4-7, 26:15-17). To the contrary, the video depicts Glenn consistently making eye contact with Sgt. Dawsey and only gesturing with his hands when he spoke.[10] *Cf. Pena-Gonzalez*, 618 F. App'x at 196 (finding nervousness where carotid artery visibly pulsed, faced twitched, and breathing was labored); *Brigham*, 382 F.3d at 508 (finding nervousness where defendants avoided eye contact and answered questions indirectly).

---

[10] A careful review of the video demonstrates that Glenn also gestured with hands while he spoke on his cell phone while waiting for Sgt. Dawsey to return from his police cruiser.

The Court also concludes that it was not suspicious for Glenn to express a willingness to remove the license plate cover after Sgt. Dawsey informed him that it was illegal. Indeed, it was reasonable for Glenn to want to rectify the error when notified by a law enforcement officer that a feature of the car was unlawful.

Nonetheless, other facts support a finding of reasonable suspicion. Courts have recognized that rental cars often serve as a common mode of transportation for drug trafficking. *United States v. Piaget*, 915 F.2d 138, 140 (5th Cir. 1990); *Johnson v. Eggebrecht*, No. 9:14-CV-144, 2015 WL 9703791, at *7 (E.D. Tex. Dec. 28, 2015), *report and recommendation adopted*, No. 9:14-CV-144, 2016 WL 165091 (E.D. Tex. Jan. 14, 2016). And the fact that Defendants' rental car had a tinted license plate cover and a screwdriver in the door console further supported the presence of reasonable suspicion. Sgt. Dawsey testified that he was surprised to see a tinted license plate cover on a rental car because, based on his experience, tinted license plate covers are used to evade law enforcement by eluding traffic cameras and covering up the vehicle's state of origin. (Doc. 124, Hr'g Tr. 27:12-23). He also testified that the screwdriver in the rental car raised his suspicion because it may have been used to install the license plate cover. (*Id*. at 150:22-151:1). Additionally, Defendants were traveling on a known drug corridor, a fact that also supports a finding of reasonable suspicion. *United States v. Powell*, 137 F. App'x 701, 706 (5th Cir. 2005) (per curium). The Court concludes that each of these unique facts, considered in their totality, created reasonable suspicion for Sgt. Dawsey to prolong the traffic stop to dispel his suspicion.

## B.    LEGALITY OF THE SEARCH[11]

### 1.    Consent to Search

A warrantless search is unconstitutional unless it meets one of a limited number of exceptions. *United States v. Zavala*, 459 F. App'x 429, 433 (5th Cir. 2012) (citing *United States v. Jenkins*, 46 F.3d 447, 451 (5th Cir. 1995)). "One exception is a search conducted pursuant to voluntary consent." *Id*. Consent to search is valid only if it is given freely and voluntarily. *United States v. Shabazz*, 993 F.2d 431, 438 (5th Cir. 1993) (quoting *Kelley*, 981 F.2d at 1470). Of course, the Government bears the burden to show by a preponderance of the evidence that consent was voluntary. *Id*.

Courts analyze the voluntariness of consent by examining six factors: "(1) the voluntariness of the defendant's custodial status, (2) whether the police engaged in coercive conduct, (3) the extent and degree of the defendant's cooperation with the police, (4) the defendant's knowledge of his right to refuse consent, (5) the defendant's level of intelligence and education, and (6) the belief of the defendant that a search will not reveal incriminating evidence." *Zavala*, 459 F. App'x at 433 (citing Jenkins, 46 F.3d at 451). No single factor is dispositive of consent. *Id*. In most cases, "some of [the] factors will not be seriously implicated, and only one or a subset of the factors will truly be at issue and drive the ultimate conclusion." *Id*.

After considering each of the six factors, the Court finds that Walker's consent was not voluntary, but the product of an involuntary custodial status and coercive police tactics. The first factor, voluntariness of custodial status, militates against the

---

[11] The Court's analysis is confined to the lawfulness of the search of the vehicle. The lawfulness of the search of each Defendants' personal effects in the vehicle was not an issue raised by the parties.

Government. Although Walker was not handcuffed or restrained, Sgt. Dawsey testified at the hearing that Walker was not free to leave at any time after he was instructed to exit the vehicle for the search. (Doc. 124, Hr'g Tr. 152:18-23). Moreover, Sgt. Dawsey's actions clearly indicated that Walker was not free to leave. Sgt. Dawsey did not issue a traffic citation, and throughout the encounter, Sgt. Dawsey retained possession of the rental agreement, insurance verification, and Glenn's driver's license—all of which resulted in a de facto detention. Thus, under these circumstances, Walker's custodial status was not voluntary. *See Shabazz*, 993 F.2d at 438 (affirming the district court's finding that the defendants were not free to leave because the officer was checking the driver's license or vehicle tag).

The second factor, coercive police conduct, also militates against the Government. Sgt. Dawsey conceded that at no time did he explicitly ask Walker for consent. (Doc. 124, Hr'g Tr. at 117:22-25; 119:3-20). A review of Sgt. Dawsey's exchange with Walker reveals that Sgt. Dawsey only *informed* Walker that Glenn, an unauthorized driver, gave consent. At no time did Sgt. Dawsey ask or request consent from Walker. Sgt. Dawsey—an officer with twenty years of experience and a trainer in his department—knew that Glenn was not authorized to give consent. In fact, Sgt. Dawsey told the other officer that he needed consent from Walker to search the vehicle. Yet, Sgt. Dawsey did not explicitly seek consent from Walker, the only person authorized to give consent.[12]

---

[12] *See United States v. Jaras*, 86 F.3d 383 (5th Cir. 1996), where a police officer received consent to search a vehicle from the driver, but then proceeded to search the luggage of the passenger, which was contained in the trunk of the vehicle. The officer never asked the passenger for consent to search his luggage and the passenger was not in the officer's presence when the driver gave consent. The district

Sgt. Dawsey never informed Walker that, as the sole authorized driver of the rental car, only he could lawfully provide consent or refuse to give consent to search the vehicle. Rather, Sgt. Dawsey used a deceptive tactic to elicit a response from Walker that the Government is now attempting to feebly hitch onto the Fourth Amendment as valid consent. *See United States v. Robertson*, 16 F. Supp. 3d 740, 748 (M.D. La. 2014), *aff'd*, 614 F. App'x 748 (5th Cir. 2015) (per curium) (finding that an officer's use of the phrase "before you go" to obtain consent to search a vehicle after the traffic stop concluded was a coercive tactic). Accordingly, the Court finds that Walker's purported "consent" was the product of a coercive police tactic.

The third factor, cooperation with the officers, militates in favor of the Government. The evidence demonstrates that Walker was cooperative throughout the encounter with Sgt. Dawsey. (Doc. 124, Hr'g Tr. 42:20-22).

The fourth factor, knowledge of the right to refuse consent, militates against the Government. When an officer retains possession of a defendant's personal effects, as was the case here, the Fifth Circuit has "found it important that the officer expressly inform the suspect of his right to refuse consent." *Zavala*, 459 F. App'x at 434. As previously noted, Sgt. Dawsey admitted that he did not inform Walker of his right to refuse consent, even though he retained possession of the rental agreement, insurance verification, and Glenn's driver's license. (*See id.* at 152:24-153:13).

---

court found that the passenger's failure to object to the search of the luggage was "implied consent." The Fifth Circuit reversed the district court's decision and noted that consent cannot be implied when the officer did not expressly or impliedly ask for consent.

The fifth factor, level of intelligence and education, marginally militates in favor of the Government. Sgt. Dawsey testified that Walker "spoke well" and that he had no doubt he understood their conversation. (Doc. 124, Hr'g Tr. at 153:14-20).

The final factor, a defendant's belief that the search would reveal incriminating evidence, is neutral. There is nothing in the record that supports a finding either way.

After weighing each of the factors, the Court finds that Walker did not voluntarily consent to the warrantless search of the vehicle. The degree of Walker's cooperation and intelligence are outweighed by the involuntary nature of his custodial status, the use of coercive police tactics coupled with the fact that he was not informed of his right to refuse consent. These factors weigh heavily against the voluntariness of his purported consent. Accordingly, the Court must conclude that the search of the vehicle was not the result of valid consent.

Having found that Walker's purported consent was not voluntary, the Court now explores whether Sgt. Dawsey had probable cause to conduct the search.

### 2.    Probable Cause to Search

In the absence of valid consent, probable cause is required to lawfully search a vehicle. Neither the Government nor Defendants addressed whether the facts of this case created probable cause to search the vehicle. The Government has relied solely upon consent to justify the search. In fact, the Government ignored Sgt. Dawsey's testimony regarding his belief that he could verbalize probable cause for the search. (Doc. 124, Hr'g Tr. 116:15-16). Despite the parties' failure to address Sgt. Dawsey's pronouncement of probable cause, the Court is inclined to conduct a probable cause

analysis to determine whether—irrespective of the invalid consent—the search was permissible under the Fourth Amendment.

It is well settled that under the "automobile exception," officers may conduct a warrantless search "[i]f a car is readily mobile and probable cause exists to believe it contains contraband." *Maryland v. Dyson*, 527 U.S. 465, 466–67 (1999) (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996)); *see Carroll v. United States*, 267 U.S. 132 (1925). Probable cause to search a vehicle exists "when trustworthy facts and circumstances within the officer's personal knowledge would cause a reasonably prudent man to believe that the vehicle contains contraband." *United States v. Banuelos-Romero*, 597 F.3d 763, 767 (5th Cir. 2010) (quoting *United States v. Edwards*, 577 F.2d 883, 895 (5th Cir. 1978) (en banc) (per curiam)). "Proof of probable cause requires less evidence than . . . proof beyond a reasonable doubt—but more than 'bare suspicion.'" *Banuelos-Romero*, 597 F.3d at 768 (quoting *United States v. Raborn*, 872 F.2d 589, 593 (5th Cir. 1989)). Similar to reasonable suspicion, "[p]robable cause is determined by examining the totality of the circumstances." *United States v. Ortiz*, 781 F.3d 221, 229 (5th Cir. 2015) (quoting *United States v. Fields*, 456 F.3d 519, 523 (5th Cir. 2006)).

Probable cause is a more demanding standard than reasonable suspicion. *Alabama v. White*, 496 U.S. 325, 330 (1990). Although the evidence in this case may support mere suspicion of possible additional criminal activity, it does not meet the higher standard of probable cause. Of the eleven facts offered by the Government to support the assertion of reasonable suspicion, the Court has concluded that only three

21

facts—a screwdriver in the door console, a rental car with a tinted license plate cover, and traveling on a drug corridor—supported a finding of reasonable suspicion.[13] These three facts, however, do not rise to the level of probable cause.

The probable cause inquiry before the Court is not whether there was probable cause to believe that criminal activity existed such as to effectuate an arrest, but whether there was probable cause that contraband or evidence of criminal activity was in the vehicle to justify the search. *United States v. Henderson*, 241 F.3d 638, 648 (9th Cir. 2000) (distinguishing between probable cause to arrest and probable cause to search). Probable cause to search a vehicle for contraband has been found where the smell of marijuana emanates from the vehicle, *United States v. McSween*, 53 F.3d 684, 686–87 (5th Cir. 1995), or where contraband is in the vehicle in plain view, *Williams v. United States*, 404 F.2d 493, 494 (5th Cir. 1968). It has also been found when an officer discovers a secret compartment on a vehicle, *Banuelos-Romero*, 597 F.3d at 768, or when a suspect admits to engaging in drug activity in the vehicle, *United States v. Payne*, 376 F. App'x 464, 465 (5th Cir. 2010) (per curium). No such facts are present here.

In contrast, the facts here are nothing more than general suspicions. A tinted license plate cover affixed to a rental car may be suspicious of criminal activity, but it is not probable cause of the vehicle containing contraband. Indeed, Sgt. Dawsey testified that license plate covers are used to evade law enforcement by eluding traffic cameras and covering up the vehicle's state of origin; he did not testify that he

---

[13] *See supra* Part A(2).

believed the tinted license plate cover was indicative of the vehicle containing contraband. (Doc. 124, Hr'g Tr. 27:20-23). Moreover, the presence of a screwdriver in the driver's door console only supported Sgt. Dawsey's suspicion that it may have been used for the installation of the license plate cover. (*Id*. at 150:22-151:1). There is no evidence before the Court to support a probable cause finding that the screwdriver may have been used to engage in additional criminal activity, such as concealing contraband in a secret compartment or that the installation of the license plate cover was in any way suggestive of the presence of contraband.

Finally, driving a rental car on a known drug corridor is also not indicative of probable cause. These facts are more akin to Defendants fitting a drug courier profile than amounting to probable cause. *Banuelos-Romero*, 597 F.3d at 768 (acknowledging that "merely fitting a drug courier profile will not suffice to raise probable cause"). Thousands of people lawfully travel in rental cars on I-10 every day. It would be absurd for the Court to conclude that this amounts to probable cause, as such a finding would upset the fundamental Fourth Amendment protections enshrined in our Constitution and erode privacy expectations for thousands of travelers.

The Fourth Amendment recognizes "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears." *Coolidge v. New Hampshire*, 403 U.S. 443, 461 (1971) (Stewart, J.). The protections of the Fourth Amendment do not dissipate in the middle of the night on the side of an interstate

highway. Courts are required "to uphold the guarantees of the Bill of Rights" and to ensure that "[t]he Constitution protects all individuals, even the unworthy, from governmental invasion of their protected rights." *United States v. Causey*, 834 F.2d 1179, 1189–90 (5th Cir. 1987) (en banc) (Rubin, J., dissenting). In the most basic terms, the Fourth Amendment's "prohibition of unreasonable searches and seizures means . . . that, without proper consent, the government may neither seize nor search private property unless there is probable cause for the action." *United States v. Williams*, 617 F.2d 1063, 1095 (5th Cir. 1980) (en banc) (Rubin, J., concurring).

Sgt. Dawsey's search was conducted without proper consent and without probable cause. As a result, the search violated Walker's Fourth Amendment right to be secure from an unreasonable search and an improper governmental invasion. Walker is entitled to the suppression of all evidence seized, and the fruits of the illegally seized evidence.

Defendants Glenn and James, however, did not enjoy a possessory interest in the rental car and their Fourth Amendment rights were not violated by the search. *See United States v. Aubry*, 55 F. App'x 717, 2002 WL 31933254 (5th Cir. 2002) (unpublished) ("Because Aubry was merely a passenger and not the owner, the renter, or an authorized driver of the rental vehicle, he did not have standing to challenge the subsequent search of the vehicle."). Fourth Amendment rights are personal and the judicially created exclusionary rule is equally personal. *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2022 (2014) ("Our cases make it clear that 'Fourth Amendment rights are personal rights which . . . may not be vicariously asserted'"); *Alderman v. United*

*States*, 394 U.S. 165, 172–73 (1969) ("The exclusionary rule . . . excludes from a criminal trial any evidence seized from the defendant in violation of *his* Fourth Amendment rights." (emphasis added)). Thus, Glenn and James are not entitled to the suppression of the evidence seized during the search.

## III.    CONCLUSION

Based on the foregoing,

**IT IS ORDERED** that Larry Walker's **Motion to Suppress (Doc. 103)** is **DENIED IN PART and GRANTED IN PART**. The motion is **DENIED** as to the legality of the stop, and **GRANTED** as to the invalid consent of the search of the vehicle. In accordance with the reasons assigned, all evidence illegally seized, and the fruits of said evidence, shall be **SUPPRESSED** as to Larry Walker.

**IT IS FURTHER ORDERED** that Walter Glenn's **Motion to Suppress (Doc. 104)** and Thomas James' **Motion to Suppress (Doc. 106)**[14] are **DENIED**. For the reasons assigned, the Court finds that Glenn and James were not unlawfully seized and that they have no standing to challenge the search.

Baton Rouge, Louisiana, this __2nd__ day of September, 2016.

_____

**BRIAN A. JACKSON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[14] James filed a motion to adopt the motions filed by his codefendants. *See* Doc. 106.